## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MOHAMMAD YUSUF AMDANI BAI**<br>    **Carr. Escénica S/N Miramar**<br>    **24030 San Francisco de Campeche**<br>    **Campeche**<br>    **México**<br><br>            *Plaintiff,*<br><br>**v.**<br><br>**ANTONY J. BLINKEN,**<br>    **in his official capacity as**<br>    **Secretary of the United States**<br>    **Department of State**<br>    **2201 C Street, N.W.**<br>    **Washington, D.C. 20520**<br><br>**and**<br><br>**UNITED STATES**<br>**DEPARTMENT OF STATE**<br>    **2201 C Street, N.W.**<br>    **Washington, D.C. 20520**<br><br>            *Defendants.* | **CASE NO. 1:24-CV-03138-JMC**<br><br>**JURY TRIAL: NO** |

## <u>AMENDED COMPLAINT</u>

Plaintiff Mohammad Yusuf Amdani Bai ("Mr. Amdani"), the former Chairman of the global textile company GK Global, through undersigned counsel, brings this action against Defendants Antony J. Blinken, Secretary of the United States Department of State, and the United States Department of State ("State Department") under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* and the Due Process Clause of the Fifth Amendment of the United States Constitution, U.S. Const. amend. V.

## Introduction

1.      Mr. Amdani is a businessman and philanthropist.  Born in Karachi, Pakistan, he comes from a family with a longstanding tradition in the textile industry, dating back to the 1940s, when they started manufacturing textiles and apparel.  Due to U.S. customers' demand for quicker delivery of products, in 1991, Mr. Amdani expanded the family business to Honduras, where he established GK Global, one of the first manufacturing companies there which produced apparel for export to the United States.  Since moving to Honduras, he has become a naturalized Honduran citizen and has also founded and operated the charitable organization the GK Foundation, whose activities are funded by GK Global.

2.      Today, GK Global is a privately held, multinational corporation which operates in the textile, real estate, technology, agriculture, and lifestyle sectors.  Headquartered in San Pedro Sula, Honduras, it has additional operations in Pakistan, the U.S., Mexico, the Dominican Republic, Guatemala, El Salvador, and Nicaragua.  In Honduras, GK Global offers business process outsourcing, turnkey manufacturing facilities, and services for a variety of U.S. and other international businesses.  Thanks in part to the services provided by GK Global, these businesses collectively employ over 27,000 people in Honduras.  For every new job created, an estimated eleven new opportunities are created for Honduran citizens.

3.      Through the GK Foundation, founded over 20 years ago and officially incorporated in Honduras in 2017, GK Global promotes health, education, environmental protection, and nutrition initiatives in Honduras and across the region.  Its high-impact programs aim to empower low-income and vulnerable populations.  Consistent with this goal, the GK Foundation, in partnership with the Honduran Ministry of Education, directly sponsors six Spanish language public schools benefitting over 5,000 children and four bilingual Spanish-English public schools benefitting over 1,000 children.  The bilingual schools use U.S. curricula and are the first of their

kind in Honduras.  Without these schools, the children would otherwise not have access to bilingual education.  The GK Foundation is piloting similar initiatives in Campeche, Mexico.

4.      In addition to the GK Foundation's initiatives in Honduras, GK Global has contributed to a number of charitable and educational organizations in the United States, including: the United Heritage Institute, a community health clinic serving 10,000 uninsured and underserved individuals in Miami and South Florida each year; the Nur Center for Women and Children, a domestic violence shelter providing housing, counseling, job training, and other services to women and children experiencing violence in South Florida; and the Islamic Foundation of South Florida's school and food pantry, which offers educational opportunities for 430 children and food supplies for over 400 families each month.

5.      Pursuant to Consolidated Appropriations Act, 2021, Pub. L. No. 116–260, §353, 134 Stat. 1182, 3129-3131 (2020), codified as 22 U.S.C. § 2277a, (hereinafter "Section 353"), Mr. Amdani was included in the December 20, 2023 update (hereinafter the "Section 353 Report") to the "Corrupt and Undemocratic Actors Report to Congress on Foreign Persons who have Knowingly Engaged in Actions that Undermine Democratic Processes or Institutions, Significant Corruption, or Obstruction of Investigations Into Such Corruption in El Salvador, Guatemala, Honduras, and Nicaragua"   The Section 353 Report[1] was submitted to Congress per the requirements of Section 353(b). The unclassified portion of the Section 353 Report is made publicly available, inviting media coverage.  Furthermore, pursuant to Section 353(d), persons who are named in the Section 353 Report are also ineligible for visas and admission to the United States, and their existing visas are to be revoked.

---

[1] Section 353 Report, *available at*:  https://www.state.gov/wp-content/uploads/2023/07/2023-Supplemental-353-report.pdf.

6.     Section 353 includes a sunset provision, stating that "[t]he authority to impose sanctions under subsection (b), and any sanctions imposed pursuant to such authority" shall expire on December 27, 2023.  However, subsection (b) only imposes on the President the requirement to issue the Section 353 Report, and update it, and does not mention any visa restrictions.  A footnote to the sunset provision indicates that the reference to subsection (b) may be a mistake.  But Congress apparently did not attempt to address this possible mistake.  As a result, it is not clear whether the sunset provision only revokes the authority to add names to the Section 353 Report, or whether it also lifts the visa ineligibility resulting from inclusion in the Section 353 Report.  This confusion is aggravated by the fact that there is no indication on the State Department webpage listing those who have been designated that any of the restrictions imposed on the designees have expired.

7.     If the visa restrictions did expire, they expired on December 27, 2023, just one week after Mr. Amdani was designated.  But whether or not they were lifted, the stigma remains.  The public identification of designees and the bases for their designations are still published in the Section 353 Report on the State Department website and in the Federal Register with no indication that they have expired.  This unjustified public branding has serious personal and professional consequences for Mr. Amdani and his family.

8.     The punitive nature of Section 353 is undeniable.  Section 353 explicitly and repeatedly refers to inclusion in the Section 353 Report and its consequences as "sanctions," referencing "[t]argeted sanctions," and "describe[ing]" the "sanctions" as well as the authority to "[i]mpos[e] … sanctions."  The Cambridge dictionary defines "sanction" as "a strong action taken in order to make people obey a law or rule, or a *punishment* given when they do not obey."[2]

---

[2] Sanction, *Cambridge University Press & Assessment* (2014), *available at*: https://dictionary.cambridge.org/us/dictionary/english/sanction.

(emphasis added).  Despite its punitive nature, there is no statute, regulation, or agency guidance that creates a process by which someone can contest their Section 353 designation.

9.      The only basis identified for Mr. Amdani's Section 353 designation is the allegation that he "brib[ed] Honduran Supreme Court officials to rule in favor of his business in a private lawsuit."[3]  Mr. Amdani adamantly denies paying any bribe to any member of the Honduran judiciary or anyone else at any point in time.  This denial is consistent with the procedural history of the lawsuit referenced in the designation.  As explained in more detail below, the *only* decision on the merits entered by the Honduran Supreme Court with respect to a business in which Mr. Amdani had an interest *vacated* an award of $159,000,000 entered by a lower court in favor of that business.  In other words, the State Department's allegation is that Mr. Amdani paid a bribe to *lose* $159,000,000.  No information has been provided by any U.S. government agency to explain this obvious contradiction.  Accordingly, Mr. Amdani's designation contradicts the available evidence and is arbitrary, capricious, and an abuse of discretion.

10.     Mr. Amdani's inexplicable inclusion in the Section 353 Report has undermined his business and reputation, causing him and his family members financial and personal harm.  The public accusation that Mr. Amdani bribed Honduran Supreme Court officials for the benefit of an unnamed business can only create the inaccurate impression that he is corrupt, a smear that interferes with Mr. Amdani's ability to conduct business, whether through GK Global or any other company.

11.     Because his designation and the bribery allegations remain public, with no indication that the visa restrictions have expired, it is highly unlikely that Mr. Amdani will ever be issued a visa, and a *de facto* ban on entering the United States remains in place.  Thus, Mr.

---

[3] U.S. Dep't of State, Bureau of Western Hemisphere Affairs, Section 353 Corrupt and Undemocratic Actors Report: 2023 at 3.

Amdani's designation also has the continued practical effect of preventing him from visiting his wife, Bushra Amdani ("Mrs. Amdani"), and their three children Ayaan (age 9), Anaya (age 7), and Ayeza (age 5) Amdani. Mrs. Amdani and the Amdani children are all U.S. citizens living in the United States. Ayaan, Anaya, and Ayeza were all born in the United States. All three children attend school in the U.S. Due to Mr. Amdani's inclusion in the Section 353 Report, however, Mrs. Amdani has been forced to raise their children, who are in school and therefore cannot visit Mr. Amdani easily, alone.

12.     In addition, Mr. Amdani has long maintained substantial connections to the United States. Mr. Amdani moved from Pakistan to the United States in 1985 to develop his textile business. From 1986 to 1991, he owned a house in Redland, California. From 1989 to 2000, he held U.S. permanent residency status. In 2020, Mr. and Mrs. Amdani bought a single-family house in McKinney, Texas through their company, Y&B Property Investments. They have paid property taxes on their family home since that time. In recent years, and until he was designated in the Section 353 Report, Mr. Amdani spent a substantial amount of time living in the United States. In 2022, he spent 79 days in the United States. In 2023, Mr. Amdani spent 112 days, almost one third of the year, in the United States.

13.     Between 2020 and the date of his inclusion in the Section 353 Report, Mr. Amdani was involved with various charities in and around McKinney, Texas. For example, he sponsored a yearly golf tournament in the community to benefit individuals with disabilities. He also supported the school his children attend with annual fundraising efforts through the sale of school uniforms.

14.     Mr. Amdani also has longstanding professional ties to the U.S. through GK Global's business with U.S. corporations. GK Global offers a variety of services to U.S.

companies doing business in Honduras and also sells to many large U.S. businesses.  In addition, GK Global formed a joint venture with a U.S. company, Delta Apparel Inc., to develop the Green Valley Advanced Manufacturing Hub, an innovative campus which provides turnkey solutions for the manufacturing industry.  Twenty-five years ago, GK Global established textile and apparel production facilities in Campeche, Mexico through a joint venture with another U.S. company, Kogland Inc.

15.     At the time of his Section 353 designation, Mr. Amdani was developing a smart city project together with one of the largest real estate developers in the Dallas area and the city of McKinney, Texas.  Had the project not been suspended due to Mr. Amdani's designation, it would have provided McKinney with a next generation sustainable, weather resistant smart city with advanced construction technology, including biophilic buildings, green infrastructure, and renewable and hydrogen-based energy.  The project was expected to create over 20,000 technology and artificial intelligence jobs in the region.

16.     The Amdani Family Foundation, which is run by Mr. Amdani's brother and funded in part by GK Global, provides valuable funding to various charitable organizations within the U.S.  Given the State Department's public allegation that Mr. Amdani bribed the Honduran Supreme Court for the benefit of one of his businesses, the Amdani Family Foundation has been placed at risk of reputational harm by Mr. Amdani's Section 353 designation.

17.     Despite many attempts by Mr. Amdani to ascertain the basis for his erroneous inclusion in the Section 353 Report, including the submission of a detailed petition to the State Department on August 2, 2024, Defendants have never provided any details concerning the factual basis for Mr. Amdani's inclusion in the Section 353 Report.  By imposing the Section 353 sanctions on Mr. Amdani in ways that exceed the scope of Defendants' statutory authority and

failing to provide Mr. Amdani with any information about the evidentiary basis for his designation, Defendants have engaged in arbitrary and capricious decision-making in violation of the APA, 5 U.S.C. Section 706.

18.     Additionally, Defendants have violated the Fifth Amendment of the United States Constitution by depriving Mr. Amdani, who has significant and longstanding ties to the United States and whose wife and children are United States citizens, of due process of law by failing to provide him with notice and an opportunity to challenge the designation.  Such lack of process is also a violation of the APA, which envisions some sort of process to persons affected by agency actions.

19.     Finally, Section 353 is impermissibly vague and should be voided.

## Jurisdiction and Venue

20.     This action arises under the U.S. Constitution and the Administrative Procedure Act, 5 U.S.C. §§ 555 and 701 *et seq.*  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States and Defendants are headquartered or reside in the District of Columbia.  Sovereign immunity does not apply under 5 U.S.C. Section 702.

21.     This Court may grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and Fed. R. Civ. P. 57.  This Court may grant injunctive relief pursuant to Fed. R. Civ. P. 65.

22.     Venue is proper in the District of Columbia as this is the district in which the events giving rise to the Complaint occurred and in which Defendants reside.  *See* 28 U.S.C. §§1391(b) and (e).

**The Parties**

23.     Plaintiff Mr. Amdani is a Honduran businessman and the former Chairman of the global textile company, GK Global.

24.     Defendant Antony J. Blinken is the Secretary of the United States State Department.

25.     Defendant State Department, located in Washington, D.C., is an agency within the meaning of 5 U.S.C. § 552(f)(1).  The State Department and the Secretary of State acted against the Plaintiff pursuant to Section 353(b), which authorizes the imposition of sanctions, *inter alia*, against individuals who, based on credible information, have knowingly engaged in significant corruption in Honduras.

**Factual Background**

*Mr. Amdani, GK Global, and the GK Foundation*

26.     Mr. Amdani is a self-made businessman and philanthropist.  Born in Karachi, Pakistan, he is a naturalized Honduran citizen.

27.     Mr. Amdani built GK Global from the ground up.  GK Global is a privately held, multinational corporation which operates in the textile, real estate, technology, agriculture, and lifestyle sectors.  Headquartered in San Pedro Sula, Honduras, it has additional operations in Pakistan, the U.S., Mexico, the Dominican Republic, Guatemala, El Salvador, and Nicaragua.  In Honduras alone, GK Global offers business process outsourcing, turnkey manufacturing facilities, and services for a variety of U.S and other international businesses.  Thanks in part to the services provided by GK Global, these businesses collectively employ over 27,000 people in Honduras. For every new job created, an estimated 11 new opportunities are created for Honduran citizens.

28.    GK Global's innovative advanced manufacturing hub, Green Valley, which was established and developed with the equity participation of two U.S. companies and its Altia Smart City project together offer the infrastructure, experience, and talent to attract leading global technology companies to Honduras.  Green Valley and the Altia Smart Cities are fully independent from the local infrastructure for electricity, water, and telecommunications.  Their buildings are U.S. Green Building Council LEED certified.  At the time of his designation, Mr. Amdani was developing a smart city project together with one of the largest real estate developers in the Dallas area and the city of McKinney, Texas.  Had the project not been suspended due to Mr. Amdani's designation in the Section 353 Report, it would have provided McKinney with a next-generation sustainable, weather resistant smart city with advanced construction technology, including biophilic buildings, green infrastructure, and renewable and hydrogen-based energy.  The project was expected to create over 20,000 jobs in technology and artificial intelligence throughout the region.

29.    Through the GK Foundation, which was incorporated in 2017 in Honduras, GK Global promotes health, education, environmental protection, and nutrition initiatives in Honduras and across the region.  Its high-impact programs aim to empower low-income and vulnerable populations.  Beyond the GK Foundation's initiatives in Honduras, GK Global has contributed to several charitable and educational organizations in the United States, including: the United Heritage Charity Foundation, the Nur Center for Women and Children, and the Islamic Foundation of South Florida.

30.    With low rates of attrition and high longevity, GK Global provides long-term upskilling opportunities for its employees.  Altia Smart City is home to high-quality education centers, training programs, and even a university campus.  From 2022-2023, GK Global invested

over $236 million in the expansion of its Honduran operations.  This investment is estimated to create an additional 12,000 spinoff job opportunities for Hondurans seeking employment.  GK Global has also been ranked as one of the best places to work in Latin America.[4]

31.    Consistent with his commitment to corporate social responsibility, Mr. Amdani also served as President of the Honduras Socially Responsible Companies Foundation (Fundación Hondureña de Responsabilidad Social Empresarial (FUNDAHRSE)) from 2016-2020.  He has repeatedly been recognized for his outstanding business achievements and commitment to corporate social responsibility.  Among other things, he has been recognized by Summa Magazine as one of the most ethical executives in the region.[5]

32.    In short, GK Global plays an important role in furthering U.S. policy goals in Central America which include addressing the root causes of migration by "work[ing] with the private sector to mobilize investment in the region to create economic opportunity" and "foster[ing] a business-enabling environment for inclusive economic growth."[6]

*Section 353*

33.    Section 353(b) requires the State Department to submit to the House Foreign Affairs Committee, the Senate Foreign Relations Committee, the House Committee on the Judiciary, and the Senate Committee on the Judiciary an annual report identifying, *inter alia*, "foreign persons determined to have knowingly engaged in significant corruption" in Honduras.

---

[4] "Los Mejores Lugares para Trabajar en América Latina en 2022," (greatplacetowork.com.ar), Aug. 3, 2022, *available at*:  https://www.greatplacetowork.com.ar/los-mejores-lugares-para-trabajar-de-latinoamerica/2022  (last visited on July 26, 2024), (last visited July 26, 2024).; "GK among the best places to work in Latin America" (gkglobal.com), Dec. 5, 2022, *available at*: https://gkglobal.com/news/gk-among-the-best-places-to-work-in-latin-america, (last visited on July 26, 2024).

[5] *Summa Magazine*, "Summa Highlights Executive Presidents and CEOs of FUNDAHRSE Member Companies," (translated from Spanish), Sept. 1, 2022, *available at*: https://fundahrse.org/revisa-summa-destaca-a-presidentes-ejecutivos-y-ceo-de-empresas-miembro-de-fundahrse/, (last visited July 26, 2024).

[6] The White House, National Security Council, "U.S. Strategy for Addressing the Root Causes of Migration in Central America," (July 2021), *available at*: https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.

34.     In making determinations under Section 353, the State Department represents that it relies on "credible information or allegations of the conduct at issue, from media reporting and other sources" and "continue[s] to review the individuals listed in the report" and "continues to actively review additional credible information and allegations…."[7]

35.     Pursuant to Section 353(d) and as stated in the Section 353 Report, foreign persons named therein "are generally ineligible for visas and admission to the United States …. [and]… shall have their visas revoked immediately and any other valid visa or entry documentation will be cancelled, absent an exception or national security interest waiver."[8]

36.     Regardless of the effect of subsection (f) of Section 353, which states that "[t]he authority to impose sanctions under subsection (b), and any sanctions imposed pursuant to such authority" expired on December 27, 2023 (one week after Mr. Amdani was sanctioned), his designation and the unfounded allegation about bribery of the Honduran Supreme Court remain public, with no indication that they have expired.  This continues to cause Mr. Amdani unwarranted damage in both his personal and professional life.  The Immigration and Nationality Act ("INA"), 8 U.S.C Section 1202(f), provides that "records of the Department of State and of diplomatic and consular offices of the United States pertaining to the issuance or refusal of visas or permits to enter the United States shall be considered confidential and shall be used only for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United State…."[9]

37.     In contrast to the INA, Section 353 requires a *public* report identifying those whom the State Department believes have engaged in significant corruption, *regardless of whether the*

---

[7] Section 353 Report, at 1-2.
[8] *Id.*
[9] Title 8, U.S.C. §1202(f), https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1202&num=0&edition=prelim

*person has applied for a visa*.  These differences make clear that Section 353 is about much more than immigration and that inclusion in the Section 353 Report has, by design, consequences far beyond an ordinary executive branch decision to deny entry.  Rather, Section 353 is designed to punish and deter corruption specifically by naming and shaming those who are designated rather than just by denying them entry, which could be accomplished by simply rejecting a visa application with no accompanying publicity.  Here (assuming that the visa restrictions expired on December 27, 2023), Mr. Amdani was only ineligible for entry into the United States for *seven days,* leaving no doubt that that the State Department's real motivation was to publicly humiliate him and destroy his professional and personal reputation.

38.     The Section 353 Report is colloquially known as the "Engel List," named after the act's sponsor Representative Eliot L. Engel.  The Engel List is an outgrowth of the No Safe Haven Commitment, which is a U.S. Government initiative intended to punish individuals who participate in severe and pervasive corruption and prevent them from fleeing the country in which they engage in bribery.  Ex. 1 (Declaration of Kathleen Hamann), ¶¶ 4-5.  As explained by Ms. Hamann, a former State Department lawyer who served as the State Department's "Anti-Corruption Czar" for the Western Hemisphere and who was one of the lead negotiators of the No Safe Haven Commitment, Section 353 designations, unlike visa determinations, are sanctions and are made public in order to punish actors alleged to have engaged in significant corruption and to deter others from engaging in similar misconduct.  *Id*. ¶¶ 1-2, 9-14.  Ms. Hamann categorizes these punishments as "sanctions", *id.* ¶ 11-14, and explains that denials of entry pursuant to the No Safe Haven Commitment mechanisms are "not visa eligibility determinations, nor are they consular determinations, nor are they decisions regarding immigration at all," but are "punitive, public

designations made by an entirely different part of the Department of State . . . pursuant to an entirely separate and secret set of procedures." *Id.* ¶ 15.

39.    Katherine Valencia, the Senior Legal Adviser for the Due Process of Law Foundation, a nonprofit organization dedicated to human rights and the rule of law in Latin America, has also publicly stated that "[a] significant element of the Engel list is that it is required by law to be made public, which differs from some other US targeted sanction programs.  For example, the 7031c sanctions … can be made public *or* private.  The fact that the Engel list must be made public demonstrates the Congressional intent to 'name and shame' perpetrators of corruption in the Northern Triangle." [10]

*Mr. Amdani's Designation*

40.    The December 2023 update to the Section 353 Report lists Mr. Amdani with the following explanation:

> **Mohammad Yusuf Amdani Bai**, a private businessman, engaged in significant corruption by bribing Honduran Supreme Court officials to rule in favor of his business in a private lawsuit.[11]

41.    No other information was provided in the designation and, despite requests by counsel for Mr. Amdani, the State Department has not provided any more information.  On August 2, 2024, Mr. Amdani, through counsel, submitted to the State Department an application for rescission of his designation.  The State Department did not respond.  On August 22, 2024, counsel sent a follow-up email requesting confirmation that the application had been received and was being considered.  The State Department did not respond.  On September 13, 2024, counsel

---

[10] Valencia, Katharine; *Justicia en las Américas*, "The significance of the Engel list: against corruption and in defense of democracy," July 8, 2021, (translated from Spanish), (last visited October 8, 2024), available at: https://dplfblog.com/2021/07/08/the-significance-of-the-engel-list-against-corruption-and-in-defense-of-democracy/.
[11] December 2023 Update to the U.S. Dep't of State, Bureau of Western Hemisphere Affairs, Section 353 Corrupt and Undemocratic Actors Report, *available at*: https://www.state.gov/wp-content/uploads/2023/07/2023-Supplemental-353-report.pdf.

sent another follow-up email reattaching the petition for recission, expressing concern over the lack of acknowledgment, and again requesting confirmation of receipt. The State Department did not respond.

42.    On September 30, 2024, counsel submitted a supplemental letter to the State Department, describing certain developments relating to the designation which are further described in paragraph 40(j) below. This email also went unanswered.

*The GDC Litigation*

43.    Upon information and belief, the "private lawsuit" referred to in Mr. Amdani's designation is litigation initiated by the Green Development Corporation ("GDC"), a special purpose vehicle for the development of a tourism project in Honduras and owned by Grupo Karims (one of Mr. Amdani's companies), and other investors against three banks. This litigation, which has been ongoing since 2009, arises out of a commercial dispute related to the defendant banks' failure to execute land deeds as per agreements with GDC in connection with a project to develop the "Mystic Bay" resort on Roatan Island in Honduras.

44.    The litigation has an extensive and complicated history, the highlights of which are set forth below.

      a.    In September 2009, GDC filed a lawsuit against banks Lafise Honduras SA, HSBC Honduras SA, and the Central American Bank of Economic Integration ("CABEI") seeking damages of $159,000,000 for restitution of unduly paid amounts, consequential damages and losses, plus the costs of the lawsuit. The three banks did not respond to the lawsuit and instead challenged the procedural basis of the claim.

      b.    In December 2009, the court of first instance denied the banks' procedural

challenges and held that the suit could proceed.  However, in March 2010, an appellate court revised this decision, finding that defendant CABEI enjoyed financial immunity, which resulted in CABEI being dismissed from the case.

c.      In December 2011, the court of first instance rendered a partial judgment in favor of GDC in a total amount of approximately $64,000,000.  Lafise Honduras SA and HSBC Honduras SA appealed the decision and GDC filed a cross-appeal seeking the full amount claimed of $159,000,000.

d.      In May 2014, the appellate court rejected the appeal of the defendant banks and rendered a judgment in favor of GDC in the amount of $159,000,000. In August 2014, the defendant banks appealed this decision to the Supreme Court of Justice of Honduras (the "Honduran Supreme Court").

e.      In August 2015, the Civil Chamber of the Honduran Supreme Court agreed to hear the appeals presented by the banks.  Although the banks presented multiple grounds for appeal, the Honduran Supreme Court limited its review to a single issue – the amount of the judgment.

f.      In October 2015, the three magistrates of the Civil Chamber attempted to reach a ruling, but they could not come to a unanimous decision. Consequently, they sent the case to the plenum of the Honduran Supreme Court for review and resolution.

g.      In September 2016, because the October 2015 ruling was not unanimous, the Honduran Supreme Court met *en banc* in a plenary session to review it. The Honduran Supreme Court overturned the October 2015 decision and

returned the case to Civil Chamber of the Supreme Court.

h.    On March 22, 2022, the Honduran Supreme Court vacated the $159,000,000 award in favor of GDC, dismissed GDC's claims, and absolved the banks of any liability.

i.    On October 19, 2022, GDC filed a criminal complaint against the Honduran Supreme Court magistrates who had vacated the award alleging that (a) they had a conflict of interest and were not authorized to rule on the case given that they had previously ruled on it as part of a separate judicial chamber and (b) their ruling went beyond the authorized scope of review as they voted to vacate the judgment in favor of GDC in its entirety when they were only authorized to review the amount of the judgment. This criminal complaint was accepted for review by Honduran Prosecutor's Office.

j.    On November 1, 2022, GDC filed a "Revision Appeal" (an extraordinary remedy under Honduran law), which is currently pending in the Honduran Supreme Court.

k.    On September 9, 2024, the Honduran Public Prosecutor's Office, through the Special Prosecutor's Office for the Prosecution of Justice Sector Officials, brought preliminary charges against the Honduran Supreme Court magistrates who vacated the award. A press release accompanying the charges, which is attached as Exhibit 2, stated that investigations had revealed that one of the magistrates had exerted influence on the plenary session, demonstrating a personal interest in the case, and that he had "undermin[ed] the impartiality and integrity of the judicial system" by

vacating the decision.

l.    On October 24, 2024, the Special Prosecutor's Office obtained a formal indictment against the three magistrates.  A statement issued by the Special Prosecutor's Office upon the return of the indictment is attached as Exhibit 3.

45.    As demonstrated by this chronology, the Honduran Supreme Court has not rendered any substantive decisions on the merits favorable to GDC and, to the contrary, its most recent ruling, which is still in effect, cost GDC $159,000,000.  It is simply inconceivable that Mr. Amdani could have paid a bribe for a decision that cost his company money, especially in the amount of $159,000,000.

46.    Moreover, Mr. Amdani has never been investigated in Honduras, or charged in Honduras, for any crime including bribery.  By contrast, the three Honduran Supreme Court judges who returned the decision against GDC have all been criminally indicted in Honduras for misconduct.  This suggests that if there was any corruption at the level of the Honduran Supreme Court in connection with the GDC litigation it was more likely committed by one of the defendant banks, not by GDC.

## Causes of Action

### Count I: Violation of the Administrative Procedure Act

47.    Plaintiff incorporates herein the allegations in paragraphs 1-46.

48.    The State Department is an agent subject to the requirements of the APA.  *See* 5 U.S.C. § 701(b)(1).

49.    Defendants' Section 353 designation of Plaintiff is a final agency action that is reviewable by this Court.  Mr. Amdani's name was submitted to a congressional committee and

the Section 353 Report was published on the State Department's website.  No process for contesting this determination is outlined in any statute, regulation, or agency guidance.  Mr. Amdani is suffering from the consequences of this decision – both in terms of reputational harm and being practically barred from entering the U.S. (despite the ostensible expiration of the Section 353 ban).  Given the absence of process and the State Department's refusal to engage with counsel, Mr. Amdani has no further recourse other than to seek relief before this Court.

50.     The doctrine of consular nonreviewability does not apply to Section 353.  "[T]he doctrine of consular nonreviewability is not triggered until a consular officer has made a decision with respect to a particular visa application."[12]  In this case, Mr. Amdani is not challenging the denial of a visa application.  Rather, he is challenging his erroneous inclusion in the Section 353 Report and the process by which he has been, and continues to be, sanctioned by the United States.

51.     The inapplicability of the doctrine of consular nonreviewability is evidenced, *inter alia*, by the fact that the processes for a Section 353 designation and visa denial are procedurally distinct.  Exhibit 1 (Declaration of Kathleen Hamann), ¶¶ 9-14.  Eligibility for entry determinations are made by commissioned consular officers and are based on the satisfaction of particular criteria outlined by law.  By contrast, a Section 353 designation is made initially by an Embassy and confirmed by the State Department Bureau of International Narcotics and Law Enforcement Affairs ("INL") (which is not a part of the Bureau of Consular Affairs) based on allegations of corruption.  *See id*. ¶¶ 9, 11.  Section 353 designations are public.  Visa applications, and denials, by contrast, are required by the Immigration and Nationality Act to be kept confidential.  *See id*. ¶¶ 10,12.  As Ms. Hamann explains, the doctrine of consular nonreviewability was simply not intended to apply to Section 353 designations.  *See id*. ¶ 18.

---

[12] *Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the U.S. v. Kerry*, 168 F. Supp. 3d 268, 290 (D.D.C. 2016) (internal quotation marks and citations omitted).

52.    Section 353 designations are akin to a sanction in that they are intended to punish and deter individuals who have been found to engage in certain categories of behavior and are accordingly listed together in the Foreign Affairs Manual ("FAM") with other sanctions regimes that result in "[i]neligibility based on sanctioned activities" at 9 FAM 302.14.[13]

53.    The plain language of Section 353 further confirms that the denial of entry is intended to function as a sanction rather than a visa denial.  Section 353 is titled "Targeted sanctions to fight corruption" and is intended to "impos[e] targeted sanctions on individuals throughout the world."  Section 353(c)-(d).  The President is empowered to "impos[e] … sanctions" on persons listed in the Section 353 Report by making them ineligible to enter the U.S. or revoking their visas.  *See id.; see also id*. (describing Section 353 as a "sanction" 10 times). The fact that *one* of the consequences of a 353 designation (which might only have functioned for a limited time) was denial of entry does not transform what is, by its own nomenclature, a sanction, into a consular denial of a visa application.  It is labeled as a sanction, it functions as a sanction, and therefore, it is a sanction.  In this case, the punitive purpose is especially clear, given that Mr. Amdani was sanctioned one week before the Section 353 visa restrictions ostensibly expired.

54.    Courts routinely review public sanctions designations.[14]  Indeed, the APA *requires* a reviewing court to set aside agency action, where, as here, it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."[15]  Under the APA, an agency must examine the relevant data and articulate a satisfactory explanation for its action including a

---

[13] *See also* https://fam.state.gov/fam/09FAM/09FAM030214.html.
[14] *See, e.g., Changji Esquel Textile Co v. Raimondo*, 573 F. Supp 3d. 104, 107-8 (D.D.C. 2021) (reviewing plaintiff's inclusion on an "Entity List" published by the Department of Commerce in consultation with the State Department); *Joumaa v. Mnuchin*, No. 17-2780, 2019 WL 1559453, at *7 (D.D.C. Apr. 10, 2019) (reviewing plaintiff's inclusion on the Specially Designated Nationals and Blocked Persons List).
[15] 5 U.S.C. § 701(b)(1).

"rational connection between the facts found and the choice made."[16]   An agency decision is appropriately considered arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[17]

55.    Mr. Amdani's Section 353 designation is arbitrary and capricious, because it is contradicted by the factual record.  In designating Mr. Amdani, Defendants alleged that he engaged in "significant corruption by bribing Honduran Supreme Court officials to rule in favor of his business in a private lawsuit."[18]   However, as explained above, the only decision returned by the Honduran Supreme Court in the GDC litigation vacated a $159,000,000 judgment in favor of GDC.

56.    The implausibility of Defendants' designation of Mr. Amdani is underscored by the fact that no Honduran Supreme Court officials or intermediaries have been designated under Section 353 in conjunction with the GDC litigation.  Defendants' finding regarding Mr. Amdani is therefore either incomplete and unreliable or targets Mr. Amdani at the exclusion of the "select officials" Section 353 is intended to target and is therefore arbitrary and capricious.[19]

## Count II: Violation of the Administrative Procedure Act

57.    Plaintiff incorporates herein the allegations in paragraphs 1-56.

---

[16] *Motor Vehicles Mfrs. Ass'n. v. State Farm Mut. Auto Ins. Co*., 463 U.S. 29, 43 (1983) (citing *Burlington Track Lines v. United States*, 371 U.S. 156, 168 (1962)).
[17] *Id*. at 43.
[18] Section 353 Report at 3.
[19] *See* Section 353(a)(2) (noting sense of Congress that "corruption… is facilitated and carried out by … select officials").

58.    Mr. Amdani's Section 353 designation further violates the APA because it is contrary to the plain meaning of the statute and exceeds the authority delegated therein to the executive branch.  The APA requires a reviewing court to set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."[20]

59.    The plain language of Section 353 limits the authority of the executive branch to designate individuals to situations where there is a finding, memorialized in a public report, of engagement in "significant corruption."  Section 353 is ambiguous to the extent that it does not provide any guidance regarding what constitutes "significant corruption."

60.    Ms. Hamann explains that this language was integral to the policy behind the statute.  Ex. 1 (Declaration of Kathleen Hamann), ¶¶ 4-8.  She highlights that to "balance the risk of inconsistencies, capriciousness, or other infirmities" that result from public designations, "the bar to meet the threshold for designation was set deliberately high, requiring a *significant* impact on U.S. foreign policy goals." *Id.* ¶ 16 (emphasis in original).  Ms. Hamann states that this qualifier of "significance" was key to the intent of the No Safe Haven Commitment, which was aimed to prevent abuse of process and baseless accusations.  *Id.* ¶ 17.

61.    Any agency finding that Mr. Amdani engaged in "significant corruption" would necessarily exceed statutory authority by impermissibly construing the meaning of that language. Any alleged bribe by Mr. Amdani was demonstrably unsuccessful, because it cannot be contested that the Honduran Supreme Court vacated a $159,000,000 judgment in favor of Mr. Amdani's company.  The language of Section 353 does not allow an agency to substitute its judgment for what constitutes impermissible conduct where no "corruption," let alone "significant corruption",

---

[20] 5 U.S.C. § 706(2)(C); *see Loper Bright Enterprises et al. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) (confirming "courts, not agencies, will decide all relevant questions of law" arising on review of agency action … even those involving ambiguous laws") (emphasis in original) (internal quotation marks omitted).

occurred.  *See* Black's Law Dictionary (defining corruption as "[t]he act of an official or fiduciary person who unlawfully uses his station or character to procure some benefit for himself or for another person, contrary to duty or the rights of others.")[21]

### Count III: Violation of the Due Process Clause of the Fifth Amendment

62.    Plaintiff incorporates herein the allegations in paragraphs 1-61.

63.    The Due Process Clause of the Fifth Amendment of the U.S. Constitution provides that "[n]o person … be deprived of life, liberty, or property, without due process of law."[22]  This clause guarantees that parties must receive adequate notice and an opportunity to be heard before the state may deprive them of their property.[23]

64.    An alien plaintiff, such as Mr. Amdani, may nonetheless "receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."[24]  "The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society."[25]

65.    Plaintiff meets these standards.  In addition to his own longstanding personal and business ties to the United States, Mr. Amdani's wife and children are all U.S. citizens and live in their family home in McKinney, Texas.  Mr. Amdani owns property in the U.S. and pays taxes on that property.  Mr. Amdani previously held a green card.  Mr. Amdani's brother and nephew are also both U.S. citizens.  Mr. Amdani maintained a longstanding business relationship with several

---

[21] Corruption, *Black's Law Dictionary* (last accessed Nov. 1, 2024), *available at*: https://thelawdictionary.org/corruption
[22] U.S. Const. amend. V.
[23] *See Matthews v. Eldridge*, 424 U.S. 319, 348 (1976).
[24] *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990).
[25] *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950).

large U.S. companies that export from the Northern Triangle to the United States and, prior to his designation, was developing a smart city project in McKinney, Texas.

66.    The Section 353 designation has deprived Mr. Amdani of his liberty interest by damaging his reputation and effectively preventing him from living and traveling freely to visit his wife and young school-age children in the United States as well as engaging in business and business development in the United States.[26]

67.    Plaintiff's Section 353 Report designation was levied without advance notice or an opportunity for Plaintiff to be heard.  Despite repeated attempts by Plaintiff to seek information about the evidence underlying the designation or an opportunity to provide information supporting a delisting, Defendants have yet to provide Plaintiff with any meaningful explanation as to why he was designated beyond a repeated and erroneous statement that Plaintiff engaged in significant corruption by "brib[ing] Honduran Supreme Court officials to rule in favor of his business in a private lawsuit."[27]

68.    Mr. Amdani has not been afforded any opportunity to engage with the agency that sanctioned him, either prior to or following the imposition of the sanctions.  Section 353 provides no mechanism to challenge a designation nor a process for obtaining delisting and his application for reconsideration has remained unacknowledged for months.  There is no indication that Defendants have received, reviewed, or considered the application, and no indication that they intend to do so at any point.  This delay appears intended to avoid a resolution entirely.  According to Ms. Hamann, this is exactly what the No Safe Haven Commitment was intended to avoid. Exhibit 1 (Declaration of Kathleen Hamann), ¶ 17.

---

[26] *See Kent v. Dulles*, 357 U.S. 116, 125-6 (1958) ("The right to travel is part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment").
[27] Section 353 Report at 3.

69.     Meanwhile, Mr. Amdani continues to suffer from the effect of the sanctions on his personal life and his business, and continues to expend resources to try to secure some kind of process where he can be heard.  In such circumstances, the process of contesting to the Section 353 designation has, in itself, become a punishment.  Publications by Malcolm M. Feeley, *The Process Is the Punishment: Handling Cases in a Lower Criminal Court*, and the Partnership for Justice, *The Process Is the Punishment: How the Criminal Legal System Punishes Those Presumed Innocent*, have argued that a criminal justice system that causes such extensive harm prior to any determination of guilt is inherently unjust.

70.     In short, Mr. Amdani finds himself trapped in a Kafkaesque nightmare in which he has inexplicably been publicly accused of a serious crime that contradicts all available evidence but has no way to challenge the allegations or even obtain more information about them.

## Count IV: Void for Vagueness

71.     Plaintiff incorporates herein the allegations in paragraphs 1-70.

72.     Laws that are impermissibly vague should be invalidated.[28]  A statute is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."[29]  This doctrine applies beyond criminal statutes and requires strict scrutiny where a constitutional right, such as due process,[30] is implicated or where the effect of the statute is otherwise drastic or stigmatizing.[31]

---

[28] *FCC v. Fox TelevisionStations, Inc.*, 567 U.S. 239, 253 (2012).

[29] *United States v. Williams*, 553 U.S. 285, 304 (2008).

[30] As previously discussed, Plaintiff has sufficient contacts with the United States to assure him protection under the U.S. Constitution.

[31] *See Jordan v. De George*, 341 U.S. 223, 231 (1951)(applying vagueness doctrine to deportation statute because "deportation is a drastic measure and at times the equivalent of banishment or exile"); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982) (applying vagueness doctrine to statute that imposes only civil penalties but is "quasi criminal" in its stigmatizing effect).

73.     Subsection (f) of Section 353, which contains the sunset provision for the statute, states that certain authority granted under the statute expires on December 27, 2023.   However, it is unclear which authority expires.  The language of subsection (f) states that it is "[t]he authority to impose sanctions under subsection (b), and any sanctions imposed pursuant to such authority" expired.  However, subsection (b) imposes a requirement on the President to issue the Section 353 Report, and to update it, with no mention of visa restrictions.   Moreover, a footnote states "[s]o in original.  Probably should be 'subsection (c).'"

74.     The difference between subsections (b) and (c) is significant.  The former relates solely to the requirement to add names to the Section 353 Report, while the latter implicates the visa ineligibility and revocation that results from inclusion in the Section 353 Report.  The tension between the language of the subsection and its footnote makes it unclear whether Mr. Amdani remains ineligible to enter the United States, or whether that ban expired on December 27, 2023. Indeed, the fact that the footnote uses the term "probably" underscores just how facially unclear the statute is as drafted.  Without clarity on its face, the law is impermissibly vague in all of its applications, even prior to enforcement.

75.      Mr. Amdani's ability to enter the country where his wife and children reside, and where he maintains a residence and significant personal and business contacts, should not be subject to such ambiguity.  A statute such as this one, which has significant ramifications for the lives of persons who are designated, should provide clarity so that persons potentially subject to it can adjust their behavior accordingly, rather than being at the mercy of arbitrary enforcement. Instead of clarity, Section 353 provides confusion.

### Count V: Violation of the Administrative Procedure Act

76.     Plaintiff incorporates herein the allegations in paragraphs 1-75.

77.    The APA requires a reviewing court to set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."[32]

78.    The APA contemplates a certain level of process for the resolution of claims.  It states that "[s]o far as the orderly conduct of public business permits, an interested person may appear before an agency or its responsible employees for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency function.  With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it."[33]

79.    No "appearance" has been afforded to Mr. Amdani.  Defendants have refused, despite repeated requests, to review and consider the evidence calling into question the basis for Mr. Amdani's designation.  Under Defendants' apparent interpretation of Section 353, they can take action that drastically and negatively affects the lives of individuals, without ever having to engage with that person.  This runs counter to the intention of the APA and is outside the scope of the statute.

## **Requested Relief**

Wherefore, Plaintiff respectfully requests that this Court:

80.    Set aside Defendants' actions as unlawful and declare and/or order Defendants to rescind Mr. Amdani's designation under Section 353;

81.    Order Defendants to issue a written, reasoned decision on Plaintiff's pending delisting petition;

---

[32] 5 U.S.C. § 706(2)(C); see *Loper Bright Enterprises et al. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) (confirming "courts, not agencies, will decide all relevant questions of law" arising on review of agency action … even those involving ambiguous laws") (emphasis in original) (internal quotation marks omitted).
[33] 5 U.S.C. § 555(b).

82.    Enter a judgment declaring Section 353 void for vagueness;

83.    Direct the State Department to issue a public statement rescinding Mr. Amdani's designation;

84.    Grant an award to Plaintiff of costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*, and any other applicable provision of law; and

85.    Such other and further relief as the Court may deem proper.

Dated: November 29, 2024                    Respectfully Submitted,

*/s/ Thomas A. Firestone*
Thomas A. Firestone* (1500468)
Morgan A. Miller (1047207)
Mary E. Maloney (90018623)
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
thomas.firestone@squirepb.com
morgan.miller@squirepb.com
mary.maloney@squirepb.com

Tamara Rozina**
SQUIRE PATTON BOGGS (US) LLP
1120 Avenue of the Americas, 13th Floor
New York, NY 10036
Telephone: (212) 872- 9800
Facsimile: (212) 872- 9815
tamara.rozina@squirepb.com

*Counsel for Plaintiff*

* *LEAD ATTORNEY TO BE NOTICED*
** *pro hac vice pending*

**CERTIFICATE OF SERVICE**

I, Thomas A. Firestone, certify that on November 29, 2024, I caused a copy of the foregoing to be served on all counsel of record.

/s/ Thomas A Firestone
Thomas A. Firestone