# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **MOHAMMAD YUSUF AMDANI** | **CASE NO.** |
| *Plaintiff* | |
| **V.** | |
| **ANTONY BLINKEN, SECRETARY OF THE UNITED STATES DEPARTMENT OF STATE, AND THE U.S. DEPARTMEMT OF STATE** | |
| *Defendants* | |

<u>**DECLARATION OF KATHLEEN M HAMANN**</u>

My name is Kathleen M Hamann and I intend to offer opinions in support of Plaintiff Mohammad Yusuf Amdani in this lawsuit brought by him against Defendants Antony Blinken, Secretary of the United States Department of State, and the U.S. Department of State.

<u>**Qualifications**</u>

1.     I have thirty years of experience in foreign policy and legal matters surrounding transnational efforts to combat official corruption.  From January 1994 to May 2004, I was a commissioned consular officer and secretary in the United States Foreign Service and a GS-14 in the civil service, serving in the Bureau of Consular Affairs (CA), the Bureau of Western Hemisphere Affairs (WHA), and the Bureau of International Narcotics and Law Enforcement Affairs (INL) in addition to my overseas assignments.  Among other roles, I was staff assistant to the Assistant Secretary for CA; acted as the WHA Assistant Secretary's "Anti-Corruption Czar," designing and implementing the first government-wide action plan to combat corruption in the

Western Hemisphere; and Deputy Director of the Anticorruption and Good Governance Team in INL's Office of Crime Policy.

2.      While serving in WHA and INL, I was one of the architects and negotiators of the No Safe Haven Commitment, an effort by the U.S. government to secure international agreements to deny entry into the United States by participants in grand corruption, seize and repatriate their stolen assets, and to improve mutual legal assistance to that end.  I was a primary author of Presidential Proclamation 7750, implementing the No Safe Haven Commitment, the first mechanism in the United States to deny entry based on wholly foreign corruption, and drafted and secured approval from the interagency – more than fifty offices all together – of the policies and procedures governing how and when entry would be denied pursuant to the proclamation.  While working in INL, I personally oversaw the first denials of entry pursuant to those policies and procedures.  I was decorated three times specifically in connection with the No Safe Haven Commitment, including one Meritorious Honor Award and two Superior Honor Awards.  I have provided expert analysis of the No Safe Haven Commitment, Presidential Proclamation 7750, and subsequent laws to national and intergovernmental organizations on several occasions since that time, including to the Organization of American States in 2005 and the Twelfth International Anticorruption Conference in 2006.

3.      After my time at the Department of State, I was a trial attorney in the Foreign Corrupt Practices Act unit of the Department of Justice (DOJ) from 2006 to 2014 and an international policy advisor to the DOJ Criminal Division on matters related to combatting transnational corruption from 2010 to 2014, during which time I received the Assistant Attorney General's award twice, once for my work as a trial attorney and once for my work as international

policy counsel.  Since 2014 I have been in private practice, where I practice both international and criminal law.

**Significant Corruption Under the No Safe Haven Commitment**

4.    Fifty-three jurisdictions subscribe to the No Safe Haven Commitment – an agreement, still in effect,[1] to deny the corrupt access to their country's territory and financial system - through the Group of Eight, Summit of the Americas/Organization of American States, and APEC.[2]  The purpose of the No Safe Haven Commitment was punitive – it was intended to prevent those who participate in grand corruption[3] from being able to enjoy their ill-gotten gains by fleeing countries harmed by their corruption.  As explained by then-Commerce Secretary Don Evans when the U.S. effort to secure adherence to the commitment was launched: "We are sending a clear message: you and your money cannot hide.  You will be found.  And you will be sent home. We hope that every country will join us to create an international "no safe haven" policy that denies corrupt officials the ability to travel freely, launder money, and act with impunity."  (Remarks at

---

[1] Implementation of the commitment has evolved over time, not just in terms of denial of entry, but also in terms of anti-money laundering and asset repatriation.  For example, DOJ's Kleptocracy Asset Recovery Initiative, which has recovered billions in corrupt assets and repatriated them to the countries from which they were stolen, has its roots in the No Safe Haven Commitment, as does the World Bank Stolen Asset Recovery Initiative, the Arab Forum on Asset Recovery, and the Ukraine Forum on Asset Recovery.  The structures for cooperation in this regard are currently being used heavily in support of the sanctions against Russian elites following the invasion of Ukraine.

[2] Group of Eight Declaration of Evian, June 2003 ("We will each seek in accordance with national laws to deny safe haven to public officials guilty of corruption, by denying them entry, when appropriate, and using extradition and mutual legal assistance laws and mechanisms more effectively."); Summit of the Americas Declaration of Nuevo Leon, January 2004 ("In the framework of applicable national and international law, we commit to deny safe haven to corrupt officials, to those who corrupt them, and their assets; and to cooperate in their extradition as well as in the recovery and return of the proceeds of corruption to their legitimate owners."); APEC Course of Action on Fighting Corruption and Ensuring Transparency, November 2004 ("We agree to… encourage each economy to promulgate rules to deny entry and safe haven, when appropriate, to officials and individuals guilty of public corruption, those who corrupt them, and their assets.").

[3] "Grand corruption" is not specifically defined in the agreements on the No Safe Haven Commitment, but during negotiations there was broad agreement that the efforts to collaborate to deny safe haven would be targeted at significant corruption either involving senior officials, undermining democratic institutions, or otherwise causing serious harm, in order to maximize the deterrent effect of a limited number of actions.

the Third Global Forum on Fighting Corruption and Safeguarding Integrity, Seoul, Korea, May 31, 2003.)

5.      The policy primarily targets senior government officials and heads of state, such as former Haitian President Jean-Claude "Baby Doc" Duvalier, former Peruvian President Alberto Fujimori, and former Guatemalan President Alfonso Portillo, who used corrupt funds to live lives of luxury in other countries rather than facing justice.  It also targets individuals in the private sector whose corruption of government officials is so severe and pervasive that they damaged entire economies and democracies in a significant way.  The purpose of the policy – and the Presidential Proclamation and subsequent laws implementing the policy – is to send those individuals back to face justice in their home countries and to deter future government officials and business leaders from engaging in such misconduct.

6.      At the time the U.S. launched the No Safe Haven Commitment, the U.S. had no provision in domestic law to deny or revoke a visa solely on the basis of foreign corruption, absent a criminal conviction.  The option of a finding under the so-called "foreign policy" ineligibility – Section 212(a)(3)(C) of the Immigration and Nationality Act (INA) – was considered, but the standard for such a finding, which required that the *entry* of the individual into the U.S. would have "potentially serious adverse foreign policy consequences," was difficult to meet, as mere entry into the U.S. rarely had such significant consequences.  However, Section 212(f) of the INA allows the President to deny entry into the United States to any class of aliens whose presence would be "detrimental to the interests of the United States."  Both of these sections, which formed the basis for Presidential Proclamation 7750 and subsequent legislation, specifically invoked the interests of the United States as critical to the legality of the denial of entry.

7.      In accordance with this view, Presidential Proclamation 7750, issued on January 12, 2004 and still in effect, requires that, in order for an individual to be denied entry for participation in corruption, the corruption at issue had to have "serious adverse effects" on one of four U.S. interests: (1) international activity of U.S. businesses, (2) U.S. foreign assistance goals, (3) the security of the United States against transnational crime and terrorism, or (4) the stability of democratic institutions and nations.  Subsequent provisions have added environmental and human rights concerns to this list.  In this vein, the Department of State describes both Presidential Proclamation 7750 and the Anti-Kleptocracy Provision of Department of State, Foreign Operations and Related Programs Appropriations Act (Sec. 7031(c)[4]), as being reserved for involvement in "significant corruption" to "reenforce the concept of no safe havens."[5]  Section 353 of the United States-Northern Triangle Enhanced Engagement Act 2021 (codified at 22 USC § 2277a), directed at corruption in the Northern Triangle of El Salvador, Guatemala, and Honduras – is region-specific but similarly targeted at significant corruption; more particularly, actions that "undermine democratic processes or institutions, or in *significant* corruption or obstruction of investigations into such acts of corruption…"  (Emphasis added.)

8.      At the time that Presidential Proclamation 7750 and the implementing procedures were being developed in 2003 and 2004, the need to limit its use to significant corruption related not only to the originating provisions of the INA, but also to ensuring that they were implemented consistently regardless of country or region and not viewed as arbitrary, because the denials of entry were designed to be punitive.  The U.S. officials involved in drafting and securing approval

---

[4] The section has appeared in each Department of State, Foreign Operations and Related Programs Appropriations Act in various iterations since fiscal year 2008.  It has appeared as Section 7031(c) in each year since fiscal year 2012 but appeared in different sections in prior years.

[5]      https://www.state.gov/corruption-related-designations-bureau-of-international-narcotics-and-law-enforcement-affairs-2/

of Presidential Proclamation 7750 and the implementing procedures viewed the tie to significant corruption as necessary to the legality of the denials of entry.  Moreover, the high bar of significant corruption was necessary to protect the mechanism from abuse or politicization; for example, that a member of one political party would seek to use a denial of entry to harm a political opponent, or that one commercial entity would try to get its competitors designated (particularly in countries where government officials also owned large businesses).  Given its punitive and deterrent intent and the risk of abuse, it was the expectation that the mechanism would be used rarely, and only for misconduct so serious that it impacted the United States.

**Visa Eligibility Determinations Versus Denial of Entry Sanctions**

9.    Eligibility for entry into the United States is determined under the INA, and the process of issuing or denying visas or entry by visa waiver is conducted in conformance with Chapter 9 of the Foreign Affairs Manual (9 FAM).  Visa eligibility determinations are made by commissioned consular officers, sometimes in conjunction with the Visa Office of CA.  A visa can be refused only upon a ground specifically set out in law or implementing regulations.  22 CFR 40.6 and 9 FAM 301.1-2.  Consular officers bear personal and statutory responsibility for their adjudications and such determinations cannot be delegated.  9 FAM 301.2-2 and 403.10-2. The INA and 9 FAM are an assessment of qualification and eligibility; grounds for refusal of a visa are referred to as "ineligibilities" or "inadmissibilities;" at no point do they reference a "sanction" or other punitive measure, or desired deterrent effect of a visa refusal.

10.    All records of the Department of State pertaining to the issuance or refusal of visas are confidential, exempt from the Freedom of Information Act, and shall be used only "for the formation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United States…" subject to limited exceptions not applicable here.  8 USC § 1202(f).

Visa records are confidential for a number of reasons, including to promote candor in the visa application process; to protect the significant private personal information, including health information, they contain; because they reflect an internal deliberative process not subject to disclosure or review; and also because an individual's visa status can potentially subject them to personal risk and reputational harm within their countries of residence.

11.    Denial of entry determinations for significant corruption are notably made quite differently.  The process for denial of entry under these provisions does not appear in 9 FAM. There is no assessment of eligibility; in fact, the individual is nearly always qualified for a visa under the INA.  Nor is there an application for a visa that is reviewed.  Rather, there is a determination – divorced from any actual application for a visa – based on information provided by an Embassy that the Embassy has (rightly or wrongly) determined is credible – that an individual should be barred from the United States as a punitive measure.  While the exact procedures are not public (and were, at least at one point, classified), the basic process was that U.S. missions make recommendations regarding an individual or individuals that they believe should be denied entry as a sanction for misconduct.  The INL's Office of Crime Policy – notably *not* an office within CA, which has responsibility for visa eligibility determinations – evaluates whether the criteria are met.  INL may consult with other bureaus and agencies in the determination, and the INL official who makes that determination does not bear personal responsibility for that determination, which is likely not attributed to a single individual in any event.  Denials of entry pursuant to these provisions outside of the INA are intended to be sanctions, unlike eligibility determinations, that will deter others from engaging in similar misconduct.  *See e.g.* 22 USC § 2277a (entitled "Targeted **sanctions** to fight corruption in El Salvador, Guatemala, Honduras, and Nicaragua"); Presidential Proclamation 10685 (referencing

the need to invoke all available tools "**to deter** those who perpetuate corruption" and referencing Presidential Proclamation 7750, Section 7031(c), and other authorities to deny entry).

12.     Notably, 22 USC § 2277a sanctions are required to be made very public via reports to Congress that are published on the Department of State's website, such that any google search will reveal the visa status of these individuals, in contravention of the provisions of 8 USC §1202(f).  This publicity is intentional and designed to "name and shame" individuals denied entry under the provision.  None of the State Department web pages regarding these denial of entry authorities are administered by CA, the bureau with responsibility for visa determinations.  Rather, in the case of Presidential Proclamation 7750 and Anti-Kleptocracy Provision Section 7031(c), INL maintains the web pages; WHA maintains the web page regarding 22 USC § 2277a and issues the report required by that law.

13.     The denial of entry determination made by INL is not an assessment of eligibility to enter, as prescribed in the INA or 9 FAM.  Rather, it is a determination of whether the individual has engaged in significant corruption that has had an adverse impact on U.S. foreign policy interests such that, pursuant to the No Safe Haven Commitment, they should suffer the sanction of not being permitted to enjoy the fruits of their misconduct in the United States.  It is made public in order to have a deterrent impact, as criminal sanctions such as fines or imprisonment are designed to do.  It bears much more similarity to a determination under the Global Magnitsky Act[6] – a sanctions regime – than it does to the visa adjudication process prescribed by the INA and 9 FAM.  In fact, the visa denial procedures for Presidential Proclamation 7750, 22 USC § 2277a, Anti-Kleptocracy Provision Section 7031(c), and Global Magnitsky are grouped together at 9 FAM 302.14, along with visa denials where there would be "serious adverse foreign policy

---

[6] Notably, the Global Magnitsky Act also specifically references "acts of *significant* corruption" as a basis for imposition of sanctions (which include denial of entry) under its provisions.  22 USC § 10102(a)(3) (emphasis added).

consequences." Similarly, both Global Magnitsky and 22 USC § 2277a are codified in Title 22, regarding foreign policy, not in the INA, which is Title 8.

14.    I understand that Mr. Amdani was not found ineligible to enter the United States by a consular officer at the Embassy in Tegucigalpa, nor was he found ineligible by the Visa Office. In fact, as I understand it, there was no relevant visa application pending, nor was any consular officer rendering a determination of eligibility. Rather, he was independently *designated* by INL and WHA, pursuant to a statutory authority separate from the INA, to be sanctioned with denial of entry pursuant to the No Safe Haven Commitment, and that sanction was made public in order to punish Mr. Amdani for alleged misconduct (which, I understand, he adamantly denies) with public opprobrium in order to deter others from engaging in similar misconduct similar to that alleged against Mr. Amdani because they could be excluded from the United States. The State Department is clear that harm to the reputation of designated individuals is intentional. "Designations    expose    corrupt    actors    through    media    attention…" https://www.state.gov/corruption-related-designations-bureau-of-international-narcotics-and-law-enforcement-affairs-2/. Mr. Amdani's designation stands in stark contrast to a visa denial, which would be confidential under 8 USC §1202(f).

### Conclusion

15.    Determinations of denial of entry pursuant to No Safe Haven Commitment mechanisms are not visa eligibility determinations, nor are they consular determinations, nor are they decisions regarding immigration at all. They are not visa determinations "issued at a higher level,"[7] *cf Bautista-Rosario v. Mnuchin,* 568 F. Supp. 3d 1, 6-8 (D.D.C. 2021) – they are punitive,

---

[7] INL is not at a "higher level" than CA. Both are coequal functional bureaus within the Department of State. Similarly, WHA is a regional bureau coequal to CA. Each has greater authority in areas of their specific responsibility – WHA or INL could no more overrule CA on a visa eligibility determination than CA could overrule WHA or INL on allocation of foreign assistance funds.

public designations made by an entirely different part of the Department of State – the part of the Department of State tasked with policies and procedures related to *law enforcement* and policies regarding *crime* - without the accountability of consular officers, and pursuant to an entirely separate and secret set of procedures.

16.     To balance the risk of inconsistencies, capriciousness, or other infirmities of making these punitive sanctions determinations in this fashion, and to protect the determinations from misuse - particularly given that the intent was that they would become known and would serve a deterrent effect – the bar to meet the threshold for designation was set deliberately high, requiring a *significant* impact on U.S. foreign policy goals.  It was intended that mere reporting of someone by a current government official – who could be a political opponent or a commercial rival – would be insufficient for designation.

17.     As noted above, I understand that Mr. Amdani adamantly denies the allegations in his designation and believes they did not come from a credible source.  To leave him, or others disparaged unfairly by a competitor or political opponent seeking personal gain, with no avenue to challenge the credibility of a report that led to this sanction and these punitive repercussions is not in keeping with the intent of the No Safe Haven Commitment or the implementing laws, regulations, and policies and procedures.  Rather, it is precisely the abuse of the process that we sought to prevent by tying the determination to "significant" corruption, particularly when the allegations that led to his designation appear to be contradicted by the undisputed record.

18.     The doctrine of consular non-reviewability (also known as consular absolutism) is, in my view, inapposite to determinations pursuant to the No Safe Haven mechanisms.  It is, simply put, not a consular eligibility determination, nor was it ever intended to be a consular eligibility

determination.  It is a determination regarding law enforcement and crime – a public sanction, and

in Mr. Amdani's case, one for which the threshold was not met.


Kathleen M Hamann
November 1, 2024